# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 31, 2020

Lyle W. Cayce
Clerk

No. 19-20651

Delise Adams; Gloria Flores-Olvera; Judy Perez,

*Plaintiffs—Appellants*,

*versus*

Memorial Hermann; Chips Adams; Arnold Carrasco,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:15-CV-1270

Before Smith, Willett, and Duncan, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

Delise Adams ("Plaintiff Adams"), Gloria Flores-Olvera, and Judy Perez were employed at Memorial Hermann Health System's Southwest Neighborhood Clinic. That clinic was closed, and the three were terminated. They sued, alleging violations of Title VII of the Civil Rights Act and the Family and Medical Leave Act ("FMLA"). The jury found for defendants on all claims. Plaintiffs challenge two distinct evidentiary rulings and the jury instructions. We affirm.

No. 19-20651

## I.

Memorial Hermann Health System operates hospitals and outpatient "Neighborhood Health Clinics." The outpatient clinics were created to provide affordable health care to individuals with limited or no health insurance. In 2014, it operated three such clinics: the Southwest Clinic, the Northwest Clinic, and the Northeast Clinic. Citing concerns over financial viability and treatment standards, Memorial Hermann made the decision to close the Southwest Clinic in July 2014.

In 2014, Helen "Chips" Adams ("Defendant Adams") was employed by Memorial Hermann as the Associate Vice President of Outpatient Clinics. Arnold Carrasco served as the Director for the Neighborhood Health Clinics. Both were involved in the decision to close the Southwest Clinic.

At the time of the decision, seven individuals worked at the Southwest Clinic: two nurse practitioners, Plaintiff Adams and Margaret Watson, and five medical assistants. Two medical-assistant positions were full-time and were held by Flores-Olvera and Perez. Two were part-time, held by Rachel Magallanes and Mary Lou Macias, and one was a supplemental position held by Jenifer Umana. Closing the Southwest Clinic eliminated all seven positions.

When the closure decision was made, Flores-Olvera and Perez were out on FMLA leave after recently giving birth. Plaintiff Adams was pregnant and preparing to take FMLA leave; by the time she was informed of the decision, she was in the hospital after recently giving birth.

Around this time, leadership at Memorial Hermann identified employment needs at the other neighborhood clinics. Those needs included one full-time nurse practitioner at the Northwest Clinic and one part-time medical assistant in each of the Northwest and Northeast clinics.

No. 19-20651

The Southwest Clinic employees were notified of the closure decision in a meeting on August 26, 2014. Human Resources representative Jacqueline Patterson, alongside Carrasco and Defendant Adams, notified the employees that their positions at the Southwest Clinic would be terminated. The employees were also informed that there were other positions available within the Memorial Hermann system for which they could apply. All three plaintiffs were out on FMLA leave when the meeting was held and were notified by phone soon thereafter. Plaintiffs were also informed of the three open positions and told that they were welcome to apply.

Carrasco and Defendant Adams were responsible for filling the open positions. They selected Watson for the open nurse practitioner position over Plaintiff Adams. They also selected Magallanes and Umana for the open medical assistant positions at the Northeast and Northwest clinics, respectively. Thus, all three plaintiffs and Macias were terminated. Patterson was terminated a few months later, in February 2015, when it was discovered that she had falsified information on her resume.

Plaintiffs sued, alleging discrimination under Title VII and retaliation under the FMLA. Specifically, they claimed that they were terminated because of their pregnancies and in retaliation for taking leaves of absence under the FMLA. At trial, defendants denied that the employment decisions were made for impermissible reasons. Defendants relied on, among other things, plaintiffs' performance evaluations to demonstrate that the decisions were based on legitimate factors.

Plaintiffs called Patterson as a witness in part to rebut the reliability of the performance evaluations. Specifically, they sought to introduce testimonial evidence that Patterson was instructed by Memorial Hermann's lawyers to search for plaintiffs' performance evaluations and that, after engaging in the search, she was unable to find them. At trial, the court ruled that Pat-

terson could not "testify as to conversations she had with lawyers or things she did at the direction of the lawyers." It held that such testimony was protected under either the work-product doctrine or the attorney-client privilege.

Defendants sought to introduce former Memorial Hermann HR Director Lisa Haneberg as a witness to provide testimonial evidence regarding Patterson's employment. The court permitted that testimony but limited the scope of appropriate questioning to that which would either (1) contradict unanticipated testimony by Patterson or (2) impeach Patterson for bias against her former employer. The court permitted Haneberg to testify that Patterson was fired because she lied on her resume and application. It then allowed Haneberg to testify as to the details of Patterson's fabrication.

The court instructed the jury under a but-for standard of causation for both the Title VII and FMLA claims. The jury was thus required to determine whether plaintiffs were discriminated against because of their pregnancies or because of their decisions to take FMLA leave. The jury found for defendants on all claims.

Plaintiffs assert three errors. First, they posit that the court erred when it limited Patterson's testimony under either the work-product doctrine or attorney-client privilege. Second, plaintiffs maintain that the court erred when it permitted Haneberg's testimony. Plaintiffs reason that her testimony amounted to extrinsic evidence attacking Patterson's credibility in violation of Rule 608(b) of the Federal Rules of Evidence. Finally, plaintiffs contend that the district court erred in its instructions to the jury.

No. 19-20651

## II.

### A. Exclusion of Patterson's Testimony

Plaintiffs assert that the district court committed harmful error when it limited Patterson's testimony under either the work-product doctrine or the attorney-client privilege. Because any error was harmless, we disagree.[1]

### 1. *Standard of Review*

We review the district court's application of both the attorney-client privilege and the work-product doctrine for clear error.[2] We review questions of controlling law *de novo. Taylor Lohmeyer Law Firm P.L.L.C. v. United States*, 957 F.3d 505, 509 (5th Cir. 2020); *Ecuadorian Plaintiffs*, 619 F.3d at 377.

Evidentiary rulings are reviewed under a "deferential abuse of discretion standard," *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 615 (5th Cir. 2018), and are subject to the harmless-error doctrine, *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 233 (5th Cir. 2016). Therefore, even if the district court has abused its discretion, "the ruling will be reversed only if it affected the substantial rights of the complaining party." *Nunez v. Allstate Ins. Co.*, 604 F.3d 840, 844 (5th Cir. 2010).

---

[1] Defendants assert that plaintiffs failed to preserve this issue by making a sufficient offer of proof under Rule 103(a)(2) of the Federal Rules of Evidence. To the contrary, plaintiffs adequately informed the court of the "substance of the evidence," comporting with the requirements of Rule 103. *United States v. Kay*, 513 F.3d 432, 455 (5th Cir. 2007); FED. R. EVID. 103(a)(2). Regardless, because we find no harmful error, we need not address this issue.

[2] *United States v. Edwards*, 303 F.3d 606, 618 (5th Cir. 2002) ("Because the application of the attorney-client privilege is a fact question to be determined in light of the purpose of the privilege and guided by judicial precedents, we review the district court's finding for clear error only."); *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 377 (5th Cir. 2010) (applying the same standard of review to the work-product doctrine).

No. 19-20651

## 2. *The Attorney-Client Privilege*

Claims of privilege in federal courts are governed by the "common law—as interpreted by United States courts in light of reason and experience." FED. R. EVID. 501. "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). It protects both "the giving of professional advice to those who can act on it" and "the giving of information to the lawyer to enable him to give sound and informed advice." *Id*. at 390.

"[T]he attorney-client privilege attaches to corporations as well as to individuals." *CFTC v. Weintraub*, 471 U.S. 343, 348 (1985). Communication between employees and the corporation's attorney is privileged if it is made "at the direction of corporate superiors in order to secure legal advice from counsel" concerning "matters within the scope of the employees' corporate duties." *Upjohn*, 449 U.S. at 394.

Even still, the attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts." *Id*. at 395. Thus, a fact is not privileged "merely because [a client] incorporated a statement of such fact into his communication to his attorney." *Id*. at 396.

## 3. *The Work-Product Doctrine*

Established in *Hickman v. Taylor*, 329 U.S. 495 (1947), "the work-product doctrine is distinct from and broader than the attorney-client privilege." *United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975). The work-product doctrine "insulates a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements from an opposing counsel's inquiries." *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991). It protects materials prepared in anticipation of litigation, whether those materials were prepared by the attorney or by agents

6

of the attorney. *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979).

The doctrine articulated in *Hickman* was later partially codified as Rule 26(b)(3) in the Federal Rules of Civil Procedure: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative."[3] Despite the language of Rule 26, the work-product doctrine protects both "tangible and intangible" work product.[4] Like the attorney-client privilege, the work-product doctrine "protects only the [attorney's work product] and not the underlying facts." *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1240 (5th Cir. 1982).

### 4. *Analysis*

As the parties' divergent briefing illustrates, the district court was less than clear as to whether it based its evidentiary ruling on the work-product doctrine or the attorney-client privilege. Its initial order stated that "any testimony concerning Patterson's conversation with Defendants' lawyers will not be permitted at trial." That seems to invoke attorney-client privilege. At

---

[3] FED. R. CIV. P. 26(b)(3)(A). The rule has an exception for "otherwise discoverable" materials in cases of "substantial need," which neither party asserts is relevant here. FED. R. CIV. P. 26(b)(3)(A)(i)–(ii).

[4] *Nobles*, 422 U.S. at 237; *see also* 8 CHARLES A. WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE & PROCEDURE § 2024, at 494–95 (3d ed. 2010) ("Rule 26(b)(3) itself provides protection only for documents and tangible things . . . . Nonetheless, *Hickman v. Taylor* continues to furnish protection for work product within its definition that is not embodied in tangible form . . . ."); *United States v. Deloitte, LLP*, 610 F.3d 129, 136 (D.C. Cir. 2010) ("Thus *Hickman* provides work-product protection for intangible work product independent of Rule 26(b)(3)."); *In re Seagate Tech., LLC*, 497 F.3d 1360, 1376 (Fed. Cir. 2007), *abrogated on other grounds by Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016); *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3d Cir. 2003); *United States v. One Tract of Real Prop.*, 95 F.3d 422, 427 (6th Cir. 1996).

trial, however, the court expanded that ruling. It determined that Patterson could not "testify as to conversations she had with lawyers *or things she did at the direction of the lawyers*" (emphasis added). That seems to invoke both the attorney-client privilege and the work-product doctrine.

Regardless, we need not discern the particular doctrine on which the court rested its conclusion (nor whether that conclusion was correct). That is so because any error was harmless.

An error is "harmless" if it does not "affect[] the substantial rights of the complaining party." *Nunez*, 604 F.3d at 844. Plaintiffs sought to establish that the performance evaluations were "shams." Patterson was allowed ample testimony on that theory, and the jury rejected it. It is unlikely that this additional fact would have swayed the jury.

Specifically, Patterson was allowed to state (1) that she had never seen the documents; (2) that until trial—when she was shown the alleged "sham" evaluations—she had never seen any performance evaluations on which the names were hand-written; (3) that performance evaluations were supposed to include a location, which was absent from those offered into evidence; and (4) that during her employment she had never seen a performance evaluation that lacked a designated location. The jury, therefore, had ample opportunity to adopt plaintiffs' theory that the performance evaluations were "shams."

Moreover, the evaluations were but one piece of evidence bearing on the overall legitimacy of the employment decisions. The jury's decision to reject plaintiffs' theory is supported by Memorial Hermann's additional evidence that the employment decisions were legitimate. For example, the jury heard witness testimony regarding the qualifications and exemplary performance of the employees who were selected for the open positions. In contrast, it heard testimony describing plaintiffs' disciplinary actions and their

general lackluster workplace performance.  In short, the jury had sufficient information to determine that the employment decisions were legitimate.

Limiting Patterson's testimony did not, therefore, affect plaintiffs' substantial rights.  *Nunez*, 604 F.3d at 844.  Because any mistake was harmless, the district court did not commit reversible error when it limited Patterson's testimony under either the work-product doctrine or the attorney-client privilege.

### B. Inclusion of Haneberg's Testimony

Plaintiffs aver that the district court erred by admitting Haneberg's testimony regarding specific incidents attacking Patterson's credibility in violation of Rule 608(b) of the Federal Rules of Evidence.  We disagree.

### 1. *Standard of Review*

As discussed above, evidentiary rulings are reviewed under a "deferential abuse of discretion standard," *Williams*, 898 F.3d at 615, and are subject to the harmless-error doctrine, *Heinsohn*, 832 F.3d at 233.  Therefore, even if the district court has abused its discretion, "the ruling will be reversed only if it affected the substantial rights of the complaining party." *Nunez*, 604 F.3d at 844.

### 2. *Applicable Law*

"[E]xtrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."  FED. R. EVID. 608(b).  The rule "is limited to instances where the evidence is introduced to show a witness's general character for truthfulness."  *United States v. Farias-Farias*, 925 F.2d 805, 811 (5th Cir. 1991) (per curiam).  "It in no way affects the admission of evidence of such prior acts for other purposes."  *Id.*

Rule 608 does not prohibit the introduction of extrinsic evidence used to attack the credibility of a witness where "the evidence tends to show bias or motive for the witness to testify untruthfully." *United States v. Thorn*, 917 F.2d 170, 176 (5th Cir. 1990). Further, evidence that may be inadmissible under Rule 608 if used to attack the witness's general character for truthfulness may nonetheless be admitted if offered for another purpose.[5]

### 3. *Analysis*

Plaintiffs do not contest that the district court admitted Haneberg's testimony for the purpose of impeaching Patterson's credibility on account of bias. Instead, they assert only that the court failed appropriately to limit the testimony to effect that purpose.

Plaintiffs' quibble is unpersuasive. Plaintiffs assert that the court erred by permitting Haneberg to testify regarding Patterson's falsified resume. That falsification resulted in her termination, which served as defendants' foundation for Patterson's alleged bias. It was squarely within the court's broad discretion to permit the jury to hear the details and context surrounding an occurrence properly introduced as extrinsic evidence to show a witness's bias.[6]

"[C]ourts of appeals afford broad discretion to a district court's evidentiary rulings" out of "deference to a district court's familiarity with the

---

[5] *United States v. Abel*, 469 U.S. 45, 56 (1984) ("It would be a strange rule of law which held that relevant, competent evidence which tended to show bias on the part of a witness was nonetheless inadmissible because it also tended to show that the witness was a liar.").

[6] *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008); *cf. Old Chief v. United States*, 519 U.S. 172, 187 (1997) (Evidence thus has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum . . . ."); *FDIC v. Fid. & Deposit Co. of Md.*, 45 F.3d 969, 980 n.6 (5th Cir. 1995) (affirming admission of evidence that "define[d] and 'elucidate[d] the nature of the transaction'").

details of the case and its greater experience in evidentiary matters." *Mendelsohn*, 552 U.S. at 384. The district court applied the proper legal standard by admitting extrinsic evidence for the purpose of showing Patterson's bias. *Thorn*, 917 F.2d at 176. The scope of the testimony it permitted to accomplish that purpose did not abuse its "broad discretion." *Mendelsohn*, 552 U.S. at 384.

## C. Jury Instructions

Plaintiffs contend that the district court erred by failing to offer the jury a motivating-factor instruction on the Title VII discrimination and FMLA retaliation claims. Again, we disagree.

### 1. *Standard of Review*

"Jury instructions are reviewed for abuse of discretion." *Janvey v. Dillon Gage, Inc. of Dall.*, 856 F.3d 377, 388 (5th Cir. 2017). We reverse "only when the charge as a whole leaves the court with substantial and ineradicable doubt whether the jury was properly guided in its deliberations." *Nester v. Textron, Inc.*, 888 F.3d 151, 156 (5th Cir. 2018) (cleaned up). Any error is subject to harmless-error review, such that we will not reverse unless the erroneous instructions "affected the outcome of the case."[7]

### 2. *Applicable Law*

The text of the FMLA does not specify a standard of causation for retaliation claims. The relevant section states only that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). The Department of Labor, per its regulatory author-

---

[7] *Janvey*, 856 F.3d at 388; *see also United States v. Cessa*, 785 F.3d 165, 185 (5th Cir. 2015) ("Any error [in instructing the jury] is subject to harmless-error review.").

ity, has interpreted that provision to provide for both a but-for causation stan-dard and a mixed-motive standard.[8]

Unlike the FMLA, Title VII plainly provides for both a but-for causa-tion standard and a mixed-motive standard. It prohibits various adverse em-ployment actions "because of" an individual's protected status. 42 U.S.C. § 2000e–2(a). In contrast, Section 2000e–2(m) provides that "an unlawful employment practice is established when the complaining party demon-strates that [a protected status] was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e–2(m). Proof of causation under the "motivating factor" standard is generally viewed as an alternative to the but-for standard.[9]

Both sides agree that, when both alternatives are available, it is the duty of the district court to discern the correct standard. *Smith v. Xerox Corp.*, 602 F.3d 320, 333 (5th Cir. 2010), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). A court "may give a mixed-motive instruction" if it "has before it substantial evidence that both a legitimate and an illegitimate (i.e., more than one) motive may have played a role in the challenged employment action." *Id.*

### 3. *Analysis*

As an initial matter, it is unclear whether a mixed-motive causation standard is ever proper for FMLA retaliation claims.[10] To be sure, in

---

[8] *See* 29 C.F.R. § 825.220(a)(3) (2013) (but-for standard); *id.* § 825.220(c) (mixed-motive standard).

[9] *See Autry v. Fort Bend Ind. Sch. Dist.*, 704 F.3d 344, 347 (5th Cir. 2013) (discussing disjunctively the "pretext alternative" and the "mixed-motives alternative").

[10] *See Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389–90 (5th Cir. 2013) (acknowledging Fifth Circuit precedent applying the motivating-factor standard but calling that precedent into question); *see also Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d

No. 19-20651

*Richardson v. Monitronics International, Inc.*, we endorsed that standard as *one* option a district court may apply.[11] But *Richardson*'s viability (and, along with it, the Department of Labor's regulatory interpretation) are dubious in light of the Supreme Court's more recent decisions in *Nassar* and *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009).

In *Gross*, the Court determined that a plaintiff asserting a disparate-treatment claim under the Age Discrimination in Employment Act ("ADEA") must establish but-for causation. *Id.* at 180. In *Nassar*, 570 U.S. at 362, the Court held the same as it applies to Title VII retaliation claims. To be sure, the statutory language in the FMLA is not identical to the relevant portions of the ADEA or Title VII.[12] Nonetheless, the Court's rejection of a mixed-motive causation standard in those claims places in serious doubt

---

702, 710 (5th Cir. 2016) ("[I]t [sic] unclear whether the 'causal link' requirement for FMLA retaliation claims involves the same 'but for' analysis required for Title VII retaliation claims.").

[11] 434 F.3d 327, 333 (5th Cir. 2005) ("The mixed-motive framework applies to [FMLA retaliatory discharge] cases in which the employee concedes that discrimination was not the *sole* reason for her discharge, but argues that discrimination was *a* motivating factor in her termination."). We are aware, as was the district court, of *Garcia v. Penske Logistics*, 631 F. App'x. 204, 210 (5th Cir. 2015) (per curiam), stating that "FMLA retaliation claims are analyzed solely by determining whether the discrimination was a motivating *factor* in the adverse employment decision." But because that statement was *dictum* in an unpublished decision, we are doubly unbound to it. *See, e.g.*, *Netsphere, Inc. v. Baron*, 799 F.3d 327, 333 (5th Cir. 2015) (discussing the non-binding effect of *dictum*); *Gate Guard Servs., L.P. v. Perez*, 792 F.3d 554, 560 n.3 (5th Cir. 2015) ("Unpublished opinions are not binding on this court.").

[12] We note, however, that the gulf is not all that great. The relevant distinction is that the provisions at issue in *Nassar* and *Gross* use the word "because," while the relevant provision here uses "for." *Compare* 42 U.S.C. § 2000e-3(a) *and* 29 U.S.C. § 623(b) *with* 29 U.S.C. § 2615(a)(2). Whether that distinction is material is a question we leave for another day.

the viability of that standard as applied to retaliation claims brought under the FMLA.

We need not confront that question directly, however, because *Richardson* does not categorically foreclose the use of the but-for causation standard for FMLA retaliation claims. It states only that a court ought to apply "the mixed-motive framework in *appropriate* cases." *Richardson*, 434 F.3d at 334 (emphasis added). Such cases exist when "the district court has before it substantial evidence supporting a conclusion that both a legitimate and an illegitimate (i.e., more than one) motive may have played a role in the challenged employment action." *Smith*, 602 F.3d at 333.[13] Thus, assuming mixed-motive and but-for instructions are available for both the Title VII and FMLA claims, the district court was tasked with discerning which causation standard was appropriate, given the state of the evidence.

The district court stated that it "did not have before it substantial evidence supporting a conclusion that both a legitimate and an illegitimate (i.e., more than one) motive may have played a role in the challenged employment action." In the context of the FMLA claim, the court determined that plaintiffs "were terminated either in retaliation for taking FMLA leave . . . or because their clinic closed and they failed to find employment elsewhere within the Memorial Hermann system"—in other words, the plaintiffs were terminated for the retaliatory reason *or* the non-retaliatory reason, but not both. Likewise, for the Title VII claim, the court determined that plaintiffs "were terminated either because they had been pregnant or because their clinic closed and they did not secure employment elsewhere." Therefore,

---

[13] *Nassar* did not disturb the general rule, applied in *Smith*, that a court may instruct the jury only on matters supported by the evidence. *Accord* 9C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2556, at 133 (3d ed. 2008).

No. 19-20651

the court asked "whether [this] particular case involve[d] mixed motives," *id.*, and answered that it did not. In so doing, it did not abuse its discretion.

AFFIRMED.