# United States Court of Appeals
# for the Fifth Circuit

_____

No. 24-30079
Summary Calendar

_____

United States Court of Appeals
Fifth Circuit

**FILED**
November 25, 2024

Lyle W. Cayce
Clerk

Donya D. Decou-Snowton,

*Plaintiff—Appellant*,

*versus*

Jefferson Parish; Roy Juncker, *in his individual capacity*;
Christopher Trosclair, *in his individual capacity*; Unidentified
Party,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-1302

_____

Before Graves, Willett, and Wilson, *Circuit Judges*.

Per Curiam:[*]

Appellant Donya Decou-Snowton ("Snowton") appeals the district court's order granting summary judgment in favor of Appellees Jefferson Parish, Roy Juncker, and Christopher Trosclair on her Family and Medical

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-30079

Leave Act ("FMLA") retaliation and Title VII retaliation claims. For the reasons provided below, we AFFIRM.

## Background

Snowton worked for Jefferson Parish from October 2008 to June 2020. She began her career with Jefferson Parish as a Probation Officer I and was eventually promoted to Probation Officer III. In January 2019, she began supervising the Drug Court and Alternatives to Detention ("ATD") Unit.

In March 2019, Snowton participated in drafting an anonymous complaint, alleging racial discrimination in the workplace. Snowton claims that there were rumors that she had drafted the complaint and that she began experiencing retaliation as a result. The first specific instance of retaliation that she described occurred on May 8, 2019, when Probation Manager Joan Ruiz attempted to issue Snowton a "coach and counseling" for failure to properly supervise the ATD Unit. According to Snowton, this coach and counseling did not proceed after she demonstrated that she had performed her duties. Snowton says that she told Ruiz that she believed actions had been taken against her due to the March 2019 Complaint. Snowton claimed that Ruiz subsequently "ran out" of the meeting.

Snowton also points to several incidents that occurred on August 22, 2019 after she attended a drug court hearing. During the hearing, Assistant District Attorney Blair Constant claimed that he heard Snowton grumbling in the gallery. When the hearing ended, Constant met with Snowton and Ruiz in Ruiz's office. Constant claims that the meeting devolved into an argument between him and Snowton, during which Snowton was aggressive and unprofessional. Snowton has denied that she grumbled during court or that she was unprofessional during the meeting.

Snowton and Ruiz left the meeting with Constant to attend a different meeting with Erin Ronquille, Snowton's subordinate in the Drug

2

Court/ATD Unit; Chantrell Cook, the previous drug court probation officer; Roy Juncker, the Director of the Department of Juvenile Services; Christopher Trosclair, the Assistant Director; and Gloria Meiskey, Cook's new supervisor. The purpose of this meeting was to discuss the concerns of Ronquille and Cook regarding the current drug court rotation.

Accounts of this meeting differ. Juncker says that Snowton yelled at Ronquille during the meeting, calling her a liar and saying that she would never be successful in Drug Court. Juncker further claimed that during this meeting he discovered Snowton was leaving the office for personal matters. In contrast, Snowton says that "the meeting quickly shifted" to issues between herself and Ronquille. She claims that she was "verbally attacked" by Ruiz and Juncker when she tried to deny Ronquille's accusation that she was having inappropriate meetings with the District Attorney and when she was accused of telling Ronquille that she would not make it in Drug Court. Juncker then informed Snowton that she would be taken out of Drug Court, and Snowton expressed that she felt that she had been targeted ever since the March 2019 Complaint.

After the meeting, Juncker officially moved Snowton out of the ATD/Drug Court and into the position of Casework Supervisor. This new position did not affect Snowton's salary or title as a Probation Officer III. However, Snowton called Gretchen Tilton, the HR Manager and Assistant Director of HR, after the meeting, stating that she had been attacked and humiliated. Snowton told Tilton about the March 2019 Complaint and said that she had been attacked ever since. Snowton then submitted a grievance to Tilton. Tilton instructed Snowton to submit the grievance to her supervisor, Ruiz, because grievances may only be brought directly to HR if the employee is alleging harassment based on a protected characteristic and Tilton determined that Snowton's complaint did not fall under that exception. Snowton submitted her grievance to Ruiz and accepted Ruiz's proposed solution.

Meanwhile, on August 27, 2019, Constant emailed Juncker to complain about Snowton's behavior during the drug court hearing and the subsequent meeting in Ruiz's office. Juncker asked Trosclair to investigate the incident. Trosclair collected statements from Snowton, Ruiz, and Dr. John Ryals, Jr., the Evaluation/Treatment Supervisor with the Department of Juvenile Services who was present during the hearing. At Juncker's direction, Trosclair did not collect statements from other witnesses identified by Snowton.

On September 27, 2017, Snowton's last day as ATD supervisor, Luis Bustamente (a Probation Officer III in the ATD) told Snowton that she had alerts in the BI system[1] that needed to be closed out. Snowton did not complete the alerts on September 27, and attempted to access the system the following Monday. Unbeknownst to Snowton, her access had been removed because she had transitioned to a new position. Snowton called BI customer service for assistance and regained access to the system.

On October 4, 2019, Bustamante discovered that Snowton had accessed the BI system after her credentials had been deactivated. This spurred an investigation into Snowton's unauthorized access. During the investigation, Snowton claimed that she logged onto the system to close out her alerts and that she did not believe her continued access was a problem because she might need to assist her replacement, Lashunda Thomas. However, the system records revealed that Snowton had additionally logged on October 1, 2019 and October 3, 2019, and Jefferson Parish's investigation concluded that Snowton did not close out her alerts upon regaining access. A recording obtained from Snowton's call with BI customer service further revealed that

---

[1] The BI System monitors the location of juvenile probationers in the ATD Unit.

Snowton told BI that she was removed in error and that she needed to regain access to train Thomas. Snowton did not train Thomas.

On October 11, 2019, the same day that Snowton learned of the BI investigation, Snowton filed a second grievance that complained of harassment and retaliation related to her August Grievance. She initially rejected Trosclair's proposed solution but accepted Juncker's proposed solution.

On November 5, 2019, Snowton received a pre-disciplinary hearing notice, advising her of policy violations related to her dispute with Constant and her unauthorized access of the BI system. After a hearing, Snowton was demoted to Juvenile Home Detention Supervisor.

However, Snowton never worked as a juvenile home detention supervisor. She was scheduled to report for training on November 30, 2019, but she requested sick leave for her own health condition from November 30, 2019 to December 6, 2019. Then, on December 4, 2019, Snowton requested FMLA leave from December 7, 2019 until June 7, 2020 to care for her sick husband. Jefferson Parish was tardy in responding to her FMLA leave request under Parish Policy, but after receiving an email from Snowton's attorney, it approved Snowton's FMLA leave. Juncker, however, suspected that Snowton did not actually need leave and communicated that suspicion to HR. Juncker's suspicion was heightened after he saw posts from Snowton's Facebook account. Juncker testified that he thought he was "being baited into taking an action against [Snowton]."

On December 30, 2019, Jefferson Parish contacted Snowton's attorney, stating that it had received information from Snowton's husband's physician, indicating that she would be able to return to work. Jefferson Parish had also contacted Snowton's personal physician. Snowton was directed to return to work on New Year's Eve. She did not.

No. 24-30079

On February 26, 2020, Snowton received a backdated letter, informing her that her 12 weeks of FMLA leave were set to expire on February 28, 2020 and that she was to return to work thereafter. On February 28, Snowton requested an extension of FMLA leave and an extension of leave as a reasonable accommodation under the Americans with Disabilities Act ("ADA") for her own medical condition. Juncker quickly responded to the request, stating that Snowton's 12 weeks of FMLA leave had been exhausted and additional leave was not a reasonable accommodation. He informed Snowton that her failure to return to work would result in her presumed resignation. Tilton then emailed Snowton, stating that the "response to your request for a reasonable accommodation was sent to you in error" and providing the requisite ADA forms. Jefferson Parish nonetheless processed Snowton's resignation and issued her a COBRA package, which Snowton says Tilton told her to ignore. Due to this confusion, Snowton did not pay her benefits premiums, and her benefits were cancelled. When Snowton had taken extensive leave in the past, she had been reminded to pay her benefits premiums.

From March 2020 to May 2020, Snowton exchanged several emails with HR about the adequacy of her ADA paperwork, specifically the portion filled out by her physician. Snowton last corresponded with HR on May 22, 2020, informing Tilton via email that her previously scheduled appointment with her physician had been canceled and that she had been unable to reschedule because her health insurance was now invalid. Snowton's probationary period for her new position had been set to end on May 30, 2020 but was extended until November 30, 2020.

On June 9, 2020, Juncker sent Snowton a letter in which he informed her that she was presumed resigned on June 8, 2020 for failure to report to work on June 7, 2020. In total, Snowton had received 12 weeks of FMLA leave and 70 days of leave without pay. Juncker assumed she knew that she was supposed to return to work on June 7 because that was the end date of

6

the leave she had requested in her FMLA application. Typically, Jefferson Parish reminds employees of their return-to-work date, although it is Parish policy that an employee is presumed resigned if they do not return to work at the end of their leave period and the FMLA packet states that extension of leave must be approved in writing. On June 23, 2020, despite that Snowton was no longer employed, Juncker and Ruiz authored a negative year-end re-view for Snowton's performance.

Snowton pursued an administrative appeal prior to filing a charge with the Equal Employment Opportunity Commission and ultimately this lawsuit. The appeal was dismissed.

## STANDARD OF REVIEW

"We review a grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *Pierce v. Dep't of the Air Force*, 512 F.3d 184, 186 (5th Cir. 2007) (citation omitted). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

## DISCUSSION

While Snowton asserted several claims against the Appellees, she only appeals the dismissal of her FMLA retaliation and Title VII retaliation claims. We address each in turn.

### A. FMLA Retaliation

The district court granted summary judgment to the Appellees on Snowton's FMLA retaliation claim after concluding that 1) she failed to make a prima facie case of retaliation, and 2) even if she had made a prima facie

7

case of retaliation, she had failed to show that the reasons given for her presumed resignation were pretextual.

To make a prima facie case of FMLA retaliation, a plaintiff must establish: "(1) [s]he is protected under the FMLA; (2) [s]he suffered an adverse employment decision; and either (3a) that the plaintiff was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because of the plaintiff's request for leave." *Hester v. Bell-Textron, Inc.*, 11 F.4th 301, 305 (5th Cir. 2021) (quoting *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998)). If the plaintiff makes a prima facie case, the employer must then "articulate a legitimate, non-discriminatory reason for the adverse employment action." *McArdle v. Dell Prods., L.P.*, 293 F. App'x 331, 336 (5th Cir. 2008) (citation omitted). If the employer makes this showing, the plaintiff must then rebut the proffered reasons, showing that the employer's proffered reason is a pretext for retaliation. *See id.*[2]

---

[2] In this circuit, the causation standard in FMLA retaliation cases is an unsettled question. *See Adams v. Memorial Hermann*, 973 F.3d 343, 353 (5th Cir. 2020); *Stanton v. Jarvis Christian Coll.*, 2022 WL 738617, at *4-6 (5th Cir. Mar. 11, 2022); *Campos v. Steve & Sons, Inc.*, 10 F.4th 515, 529 n.4 (5th Cir. 2021). Circuit precedent indicates that "[t]he traditional *McDonnell-Douglas* framework does not always apply in FMLA retaliatory discharge cases" but rather we apply "the mixed-motive framework in appropriate cases." *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333-34 (5th Cir. 2005). However, other panels have called that precedent into question in light of recent Supreme Court decisions. *See Adams*, 973 F.3d at 353 (first citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) (holding that a plaintiff must establish but-for causation in a Title VII retaliation claim); then citing *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009) (holding that a plaintiff must establish but-for causation in an ADEA disparate treatment claim)). Regardless, Snowton did not argue that the mixed-motive framework applied until her Reply Brief in this appeal. Plaintiff has therefore forfeited that argument. *See Guillot on Behalf of T.A.G. v. Russell*, 59 F.4th 743, 754 (5th Cir. 2023) ("[A]rguments raised for the first time in reply are generally forfeited."); *see also McArdle*, 293 F. App'x at 340 (declining to apply the mixed-motive framework when plaintiff did not argue for its application below).

No. 24-30079

In terms of the prima facie case, the parties do not dispute that Snowton is protected under the FMLA, and Snowton does not contend that she was treated less favorably than any other employee who took FMLA leave. Rather, they dispute what adverse actions were taken against Snowton and whether there is a causal connection between those actions and her leave or request for leave.[3]

An adverse employment action "is a materially adverse action that 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 470 (5th Cir. 2021) (citation omitted). Liberally construed, it appears that Snowton views the following as adverse employment actions taken against her: 1) Jefferson Parish "monitoring" her Facebook during her leave and contacting her husband's physician in violation of policy; 2) Jefferson Parish, during Snowton's administrative appeal, subpoenaing her travel records and hospital visitation records for the time during her FMLA leave; 3) Juncker's February 28, 2020 email, initially denying further leave; 4) the benefit cut; and 5) her presumed resignation.

However, as the district court stated, Snowton has not explained what makes Jefferson Parish's monitoring her Facebook, calling her husband's doctor, or subpoenaing her travel records in an after-the-fact administrative proceeding materially adverse, even if some of these actions violated Parish policy or the FMLA. Snowton has cited no law indicating that these actions are materially adverse, nor has she disputed that the Parish likely took these

---

[3] For the first time in Snowton's Reply Brief, she also points to the negative performance review as an adverse employment action. As this is the first time throughout the life of this case that Snowton has raised this theory, it is forfeited. *See Russell*, 59 F.4th at 754. Regardless, even if it is not considered forfeited, Snowton's claim is still not actionable because, as discussed below, Snowton has failed to show pretext.

actions because it questioned her actual need for FMLA leave. It seems reasonable that an employer does not take a materially adverse employment action when it simply verifies the need for leave.

As to Juncker's email, Snowton further fails to explain how this constitutes an adverse action. In any event, Juncker's email correctly stated that Snowton had exhausted her twelve weeks of FMLA leave, and it was promptly followed by Tilton's correction as to his statement about Snowton's ADA request. Jefferson Parish further allowed Snowton to remain on leave without pay following Juncker's email. Thus, while Juncker's email was certainly stress-inducing at that moment, the fact that Jefferson Parish allowed Snowton to stay on leave without pay and promptly corrected Juncker's statement counsels against construing this as an adverse employment action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("[N]ormally petty slights, minor annoyances, and simple lack of good manners" will not rise to adverse employment actions.); *see also Lindsley*, 984 F.3d at 470 (finding that an HR director's conversation with the employee, in which the director informed the employee that she would lose her position if she took FMLA leave, was not materially adverse when the director quickly corrected herself).

The benefit cut, or as more properly characterized "Snowton's loss of benefits after her FMLA leave ended," also cannot be classified as an adverse employment action when it is a natural consequence of exhausting FMLA leave. Even Snowton testified that once paid leave ceases, and the employee is no longer receiving a paycheck from which benefits are deducted, it is the employee's responsibility to pay benefits premiums. While Snowton claims that it is disputed when her FMLA leave ended, the district court correctly rejected that contention. FMLA leave lasts for twelve weeks. 20 U.S.C. § 2612. Snowton requested FMLA beginning on December 7, 2019 and Jefferson Parish communicated that twelve weeks past that date would

be February 28, 2020. The math and Jefferson Parish's communications prove the point.[4]

Snowton's presumed resignation, on the other hand, was indisputably an adverse employment action. Thus, the question is whether she has demonstrated a "causal link" between her leave and presumed resignation. *Campos*, 10 F.4th at 527. A plaintiff can establish this causal link at the prima facie stage through "very close" temporal proximity between requesting/taking leave or by otherwise providing evidence indicating causation. *See Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 884 (5th Cir. 2020) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)); *McArdle*, 293 F. App'x at 338. Snowton claims that even a four-month period is sufficient temporal proximity. But the sufficiency of that length of time is dubious, considering the Supreme Court's favorable citation of a decision holding that a three-month period is too long. *See Besser*, 834 F. App'x at 885 (citing *Breeden*, 532 U.S. at 273-74). Rather, it appears that two-and-one-half months is the outermost limit. *See Amsel v. Tex. Water Dev. Bd.*, 464 F. App'x 395, 401-02 (5th Cir. 2012); *Campos*, 10 F.4th at 525 (citing *Richard v. Cingular Wireless LLC*, 233 F. App'x 334, 338 (5th Cir. 2007)). Under that formulation, because Snowton's FMLA leave concluded on February 28, 2020 and she was presumed resigned on June 8, 2020, this three-month gap is insufficient to establish causation through temporal proximity alone.

Whether Snowton has nonetheless met her prima facie burden of showing a causal connection is a closer question. This is a "'highly fact specific' inquiry," in which we consider factors like an employer's statements expressing displeasure at the employee taking leave, "the

---

[4] However, even if we consider the loss of benefits to be an adverse employment action, as explained below, Snowton has still failed to establish pretext.

employee's past disciplinary record, and whether the employer followed its usual procedures in carrying out the adverse employment action." *Perkins v. Child Care Assoc.*, 751 F. App'x 469, 474 (5th Cir. 2018) (citation omitted); *McArdle*, 293 F. App'x at 338 (finding causation where the employee pointed to evidence of an email sent by a supervisor on the day the employee's leave began that expressed concern about the employee's "time away" and deposition testimony from another employee construing the email as questioning whether the employee's leave was legitimate); *see also Amsel*, 464 F. App'x at 402 (finding the plaintiff had failed to establish causation, noting '[t]he evidence is actually to the contrary" because the employer provided the plaintiff with over 700 hours of additional leave after he had exhausted his FMLA leave).

Here, Snowton has highlighted several pieces of evidence, including: Jefferson Parish's deviations from its policy and the FMLA by providing a late response to her FMLA leave request and in contacting her and her husband's physicians, along with a deviation from its custom to remind employees to pay their benefits premiums and when to return to work; Jefferson Parish's attempt to make her come back to work prior to the end of her FMLA 12-week leave; Juncker's viewing her Facebook posts and testifying to his skepticism over her need for leave; Juncker's initially denying her request for extension of leave; and Jefferson Parish's subpoenaing her travel records and hospital visitation records in the administrative proceeding. While Snowton certainly has not provided definitive proof that her presumed resignation was caused by her taking FMLA leave, the evidence does show deviations from Parish policy regarding her leave and skepticism over her need for leave. We assume, without deciding, that Snowton has met her initial burden.

The burden shifts to Appellees to provide a legitimate reason for her termination. They have provided two: 1) Parish policy provides that when an

employee does not return to work after expiration of leave, the employee is presumed resigned; and 2) it was necessary to fill Snowton's position to maintain the requisite staff-to-inmate ratios, which in turn furthers safety and security, and to ease the financial burden that had been incurred by placing temporary employees in the Detention Supervisor position.

The burden then shifts back to Snowton to rebut the reasons with substantial evidence, meaning evidence "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Campos*, 10 F.4th at 529 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). Based on the evidentiary record, Snowton has not sufficiently rebutted these reasons. While Jefferson Parish did break from its normal custom in failing to remind Snowton to return to work, as it had done when she was previously out on extensive leave, Snowton did not request leave extending past the date provided on her FMLA paperwork. In fact, she stopped communicating with Jefferson Parish, even though she was aware, by virtue of the FMLA paperwork, that it was official Parish policy to presume an employee resigned if they did not return after their leave expired. Further, it is undeniable that Jefferson Parish provided Snowton with significant leave past the expiration of her FMLA leave. Despite any uncertainty as to Snowton's need for leave, the Parish was ultimately very accommodating. Juncker's comments, which questioned her need for leave but do not evidence animosity towards FMLA leave itself, do not change that fact.

As to the Parish's need to fill the position for health/safety and fiscal reasons, Snowton merely states that the department had been understaffed and Juncker exacerbated the problem by terminating other detention officers. But the fact that the Parish was already understaffed cuts against Snowton's argument, and Juncker might have had legitimate reasons for terminating these other employees.

No. 24-30079

For all these reasons, Snowton has not established pretext and her FMLA retaliation claim fails.

## B. Title VII Retaliation

The district court granted summary judgment to the Appellees on Snowton's Title VII retaliation claim after concluding that she had failed to establish a prima facie case. To make a prima face case of retaliation under Title VII, a plaintiff must satisfy the *McDonnell-Douglas* framework, showing: "(1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action." *Feist v. La., Dep't of Justice, Off. of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013); *see also Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020).

A plaintiff engages in a protected activity by either "oppos[ing] any practice made an unlawful employment practice by this subchapter" or "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). As mentioned above, an adverse employment action requires a plaintiff to "show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Burlington*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). A causal connection can be established "simply by showing close enough timing between his protected activity and his adverse employment action," which this circuit construes to be two-and-one-half months. *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019) (citing *Breeden*, 532 U.S. at 273-74). Or a causal connection can be established by otherwise raising a material issue of fact as to whether the actions

14

taken against the employee were caused by the protected activity. *See Brown*, 969 F.3d at 577.

The district court determined, and the parties do not dispute, that Snowton engaged in a protected activity when she made the March 2019 Complaint that alleged racial discrimination in the workplace. It appears that Snowton further argues that she engaged in protected activity during her May 8 meeting with Ruiz, August Grievance, and October Grievance because she "opposed" the retaliation ultimately resulting from the March 2019 Complaint. In so arguing, Snowton seemingly attempts to create temporal proximity between her "protected activity" and any adverse employment actions. However, in measuring temporal proximity, only the first instance of protected activity is relevant. *See Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 428 n.23 (5th Cir. 2017) ("Ammar alleges that he repeatedly engaged in protected activity from November 2009 to June 2010. But a Title VII claimant cannot, with each protected activity, re-start 'the temporal proximity clock.'" (quoting *Hanks v. Shinseki*, No. 3:08-1594-G, 2010 WL 3000835, at *7 (N.D. Tex. July 28, 2010)). Accordingly, we will consider only the March 2019 Complaint as the protected activity.

In terms of the adverse employment action, Snowton essentially regurgitates the entire factual history of this case. Specifically, she references: the May 8, 2019 attempted coach and counseling; the August 22, 2019 Drug Court personnel meeting where she was verbally attacked and removed from supervising the ATD; Tilton's refusal to accept the August Grievance and forcing Snowton to present it to Ruiz; Constant's complaint and the subsequent investigation; Snowton's removal from BIS and the subsequent investigation involving her reactivation; her meeting with Juncker resulting from her October Grievance; her demotion; the extension of her probationary

period; her presumed resignation; and the negative evaluation after her employment had ended.[5]

But even assuming that some of these events were "adverse employment actions," we agree with the district court that there is no evidence of causation. In terms of temporal proximity, the only alleged adverse employment action that occurred within the two-and-one-half month window was Ruiz's attempted coach and counseling. But as the district court explained, an attempted coach and counseling that did not even come to fruition would not dissuade a reasonable employee from making a charge of discrimination and therefore was not an adverse employment action. *See Love v. Motiva Enters. LLC*, 349 F. App'x 900, 901 (5th Cir. 2009) (explaining that negative comments, which constituted coach and counseling, along with an oral reminder, which was the company's lowest form of discipline, was not an adverse employment action); *see also Burlington*, 548 U.S. at 68 (explaining that "normally petty slights, minor annoyances, and simple lack of good manners" will not amount to adverse employment actions).

Without temporal proximity, we are left with only Snowton's speculative belief that the actions were taken against her due to the March 2019 complaint. This is insufficient. *See Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005) (holding that an employee's speculation that she was denied a promotion due to her discrimination complaint from ten months prior was insufficient to satisfy her evidentiary burden). The district court did not err in granting summary judgment.

## Conclusion

---

[5] The district court did not specifically reference the extension of probation, presumed resignation, or negative evaluation in this section, but it did assume that Snowton was contending the "entire factual history" amounted to an adverse employment action.

No. 24-30079

For the foregoing reasons, we AFFIRM the district court.